**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 05-23296-Civ-Lenard/Torres

ROBERTO PERALTA,

     Plaintiff,

v.

PERALTA FOOD, CORP.,
a Florida corporation, and
MAXIMO PERALTA, individually,
both jointly and severally,

     Defendants.

_____/

**ORDER ON DEFENDANT'S MOTION TO SET ASIDE AND VACATE
THE DEFAULT AND DEFAULT FINAL JUDGMENT AND DEFENDANT'S
MOTION TO STAY COMPLIANCE WITH SETTLEMENT AGREEMENT**

This matter is before the Court on Defendant's Motion to Set Aside and Vacate the Default and Default Final Judgment [D.E. 41] and Defendant's Motion to Stay Compliance with Settlement Agreement [D.E. 40], pursuant to an Order of Reference entered by the Honorable Joan A. Lenard, United States District Judge [D.E. 65]. Following initial briefing on the motion, an evidentiary hearing was held on April 6, 2007, following which the Court ordered the parties to file supplemental briefs in further support of their positions. The Court has reviewed all papers filed by the parties in connection with this motion, has weighed the evidence presented at the hearing, and has considered the legal arguments of counsel. The matter is thus ripe for disposition.

## *I.* BACKGROUND

Defendant Maximo Peralta ("Maximo") owns and operates a grocery store known as Mar y Tierra Supermarket d/b/a Peralta Food, Corp. Plaintiff Roberto Peralta ("Roberto") is Maximo's second cousin. According to Maximo, after Roberto immigrated

to the United States from the Dominican Republic, Maximo hired him as the Assistant Manager of Mar y Tierra Supermarket when he opened the store.  Maximo entrusted Roberto with extensive discretion to perform his job duties.  Roberto supervised the employees, chose and contracted with vendors and suppliers and had oversight and control over accounts payable and receivable as it related to vendors and suppliers. Roberto had unlimited sick time, vacation time and personal days.  His salary was not reduced when he took partial days off from work.  Roberto also had extensive paid vacation leave.  Roberto would spend an average of two months per year visiting his wife in the Dominican Republic and he was paid for those days off from work.

Mar y Tierra Supermarket was open seven days per week, fifteen hours per day (8am to 10pm). Occasionally, the working hours extended thirty minutes before the store opened and thirty minutes after the store closed.  Therefore, according to Roberto, the entire work week was comprised of approximately 105 to 112 hours.  The Supermarket was open for shorter hours on certain holidays such as Christmas and Thanksgiving.

These circumstances are central to the filing of this lawsuit by Roberto on December 23, 2005.  Shortly beforehand, Roberto and Maximo had a falling out.  Roberto wanted to have a partnership interest in the business, which Maximo balked at. In November 2005, Roberto informed Maximo that he would leave the store at the end of the month.  Soon after, Roberto filed the lawsuit claiming that he had not received all the wages that he was owed for his hard work at the Mar y Tierra Supermarket.

In response to the lawsuit, Maximo hired an attorney by the name of Spencer Emison.  Maximo was referred to Mr. Emison by his accountant.  The record does not reveal, however, what experience, if any, Mr. Emison had in litigating in federal court, or with FLSA cases in particular.  Mr. Emison was subpoenaed to appear at the evidentiary hearing held before the Court in this matter, but his whereabouts are apparently

unknown as he was never properly served and did not voluntarily appear at the hearing notwithstanding his knowledge that the hearing was proceeding. In any event, Court records show that Mr. Emison was admitted to the bar of this Court in May 1994.

On January 13, 2006, Roberto filed his amended complaint, asserting minimum wage and overtime violations under the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq.* On May 5, 2006, Defendants filed their answer and affirmative defenses to the amended complaint. After that, however, Mr. Emison failed to satisfy his obligations to the Court and his client. He failed to respond to Plaintiff's request for agreement on a joint scheduling report, failed to comply with discovery requests served on him, and even worse failed to comply with Orders of the Court.

On June 27, 2006, for instance, this Court entered an Order to Show Cause in which it granted an extension of time for filing a joint scheduling report. In its Order, the Court noted Plaintiff's representation that he made "several unsuccessful attempts to contact counsel for Defendants," Spencer A. Emison, regarding the preparation of the report. The Court ordered that, if the report was not filed by June 30, 2006, Defendants would have to show cause as to why the Court should not strike Defendants' answer and affirmative defenses and enter a default against them.

On May 3, 2006, Plaintiff served discovery on Defendants and scheduled the deposition of Maximo for May 30, 2006. Defendants' attorney did not respond to the discovery requests or attend the May 30th deposition. On July 5, 2006, the Court granted in part Plaintiff's motion to compel discovery, reserving the issue of sanctions for a later date. The Court expressed concern over Defendants' counsel's continued failure to respond and sent the Order to Defendants directly as well. Maximo alleges in this proceeding that he cannot read English and assumed Mr. Emison would address all legal matters related to the lawsuit. He also testified that he was told of the date for the taking

of his deposition but that Mr. Emison then called back and told him it had been cancelled.  Maximo, however, failed in this regard by making sure that someone he trusted translated the document for him and by then seeking new legal advice.  Had he done that upon receipt of the Court's July 5th Order, he may have mitigated in time the damage that Mr. Emison was causing by his nonfeasance.

We now know from an affidavit filed in this matter by Mr. Emison that he claims he was experiencing severe emotional depression during this period of time, which rendered him unable to properly defend the Defendants.   Mr. Emison's affidavit fails to explain, however, why he could not have made one phone call to find Maximo another lawyer or at least tell Maximo he was on his own.  Mr. Emison also failed to explain why he could not have filed a one-paragraph notice with the Court of his inability to proceed in the case, which would have prompted the Court to issue an Order to Mr. Peralta to find himself a new lawyer.

In any event, having failed to comply with any of his fiduciary obligations to his client and his responsibilities to the Court as an Officer of the Court, the Court was faced with no alternative but to enter a default and default judgment against Defendants on July 11, 2006, and July 19, 2006, respectively, for "Defendants' repeated failures to respond to requests by Plaintiff or comply with Orders of the Court [.]"

According to Maximo, he was unaware throughout this period of the gravity of the situation and the fact that judgment had been entered against him.  He clearly learned of the extent of the problem on September 1, 2006, when Roberto's lawyer and several United States Marshals arrived at the store to execute on the judgment.   When they arrived, the Marshals closed the supermarket and began the process of searching for seizable goods and equipment.  At the end of that process, approximately $50,000 worth of cash, CDs and bank accounts were seized.

During this process, Maximo finally was able to reach Mr. Emison by telephone to tell him what was happening and to ask him to explain.  After initially telling him that he was occupied doing other things, Mr. Emison finally agreed to go to the supermarket to and deal with the situation.  Once he arrived, he met with Roberto's lawyer and, at the Marshals' suggestion, began negotiating with him over the terms of a settlement agreement that would resolve the need for further execution proceedings.  Over the course of two hours, Mr. Emison negotiated the terms of an agreement with Mr. Norrell, utilizing Mr. Norrell's laptop computer.  Ultimately, they agreed to drop any further execution efforts in exchange for a written agreement that agreed to drop all appeals and pay a sum certain under a payment plan.  Maximo, in the presence and with the advice of Mr. Emison, signed the settlement agreement to stop the seizure.  Under the settlement agreement, Defendants agreed to pay the judgment plus $20,000 in legal fees and costs in the form of a payment plan.

Maximo testified at the hearing, however, that he was not advised that he could have sought to move to set aside the default judgment under the circumstances, rather than simply enter into a settlement agreement for a payment plan.  Maximo claims he would not have signed the agreement had he been properly advised of that opportunity.

Then Maximo discharged Mr. Emison and retained his present counsel on or about September 20, 2006.  His present counsel, who sadly for Maximo were not originally retained in the case, now move to set aside the default and default judgment and to set aside the settlement agreement.[1]

---

[1]    Although the relief sought, according to the motion's title, appears to be a stay of the settlement agreement, the body of the motion indicates that Defendant seeks to set aside the settlement agreement.  Accordingly, the Court will treat Defendant's Motion to Stay Compliance with Settlement Agreement [D.E. 40] as a motion to set aside the settlement agreement the parties entered into on September 1, 2006.

## II.  ANALYSIS

### A.   *Motion to Stay/Set Aside the Settlement Agreement*

Defendant's new counsel have forcefully raised various arguments to highlight the injustice that has befallen their client and to convince the Court to undo the damage caused by Mr. Emison.  They face an uphill battle.  They concede that Florida contract principles initially govern the effect and enforceability of the settlement agreement that their client signed.  *See Mergens v. Dreyfoos, Jr.,* 166 F.3d 1114, 1117 (11th Cir. 1999).  In Florida and elsewhere, the law favors the finality of settlements.  *Pettinelli v. Danzig,* 722 F.2d 706, 710 (11th Cir. 1984); *DeWitt v. Miami Transit Co.,* 95 So. 2d 898 (Fla. 1957).  "In the absence of a showing of fraud or undue influence [a settlement] is decisive of the rights of the parties thereto and operates as a bar to the reopening of the original controversy."  *Mergens,* 166 F.3d at 1117 (quoting  *MWS Wire Indust., Inc. v. California Fine Wire Co.,* 797 F.2d 799, 802 (9th Cir. 1986)).

On its face, therefore, the settlement agreement that Maximo executed, with the assistance and advice of his counsel – negligent though he may have been – constitutes a binding resolution of whatever rights and remedies he had available to him at the time.  "[A]ny rights and duties the parties had at that moment were merged in their settlement agreement, unless stated otherwise."  *J. Allen, Inc. v. Castle Floor Covering, Inc.,* 543 So. 2d 249, 251 (Fla. 2d DCA 1989).  The settlement agreement's provisions, therefore, become binding on the parties and this Court.  *E.g., M&C Assocs. v. State of Fla. Dept. of Transp.,* 682 So. 2d 640 (Fla. 2d DCA 1996)  Consequently, this Court – no matter how sympathetic it is to Maximo's unfortunate circumstance and regardless of the merits of Maximo's defenses to the default judgment or chance of success on appeal – cannot reopen the matter now to determine whether or not the default judgment was correctly

entered or whether the amount included in that judgment was reasonable or not.  *See J.R. Bruce Corp. v. Ramsey,* 500 So. 2d 583 (Fla. 2d DCA 1986).

Recognizing this well established principle, Maximo's counsel argues that the Court should set aside the settlement agreement on grounds of duress.  They argue that, under Florida law, a contract or settlement may be set aside on the basis of duress or coercion when one of the contracting parties has improperly influenced the other into entering the agreement.  *See Vitakis-Valchine v. Valchine*, 793 So.2d 1094, 1096 (Fla. 4th DCA 2001). "Duress is a condition of mind produced by an improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition."  *City of Miami v. Kory*, 394 So. 2d 494, 497 (Fla. 3d DCA 1981) (quoting *Herald v. Hardin*, 116 So. 863, 864 (1928)).  Defendant concludes that the settlement was the product of duress, rather than an exercise of his own free will.  He states that he signed the settlement agreement because he believed this would stop Plaintiff, Plaintiff's attorney and the U.S. Marshals from immediately seizing all of the assets in his business.

Florida courts have articulated two factors that must coexist when setting aside a contract or settlement on the grounds of duress.  *Kory*, 393 So. 2d at 497.  Specifically, [i]t must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side."  *Id.*  The problem with Defendant's argument is that the facts of this case show that there was no improper external pressure.  Defendant testified, and his motion states, that he signed the settlement agreement to stop the U.S. Marshals from seizing assets from his business. Plaintiff's execution of a default judgment, however, cannot constitute duress because it

is not improper or coercive conduct.  It was Plaintiff's right to execute on the default judgment he obtained.  Even the case law cited by Defendant supports this very point.

In *Kory*, the Court said:  "[I]t is not improper and therefore not duress to threaten what one has a legal right to do."  *Id.* at 498.  Even if the default judgment could have been set aside at a later date, at the time that Plaintiff attempted to execute on it, it was perfectly valid.  Defendant cannot claim that U.S. Marshals, acting under color of law and the direction of this Court, exerted an "improper" external pressure on Defendant amounting to duress.  To the contrary, the pressure they exerted was by definition proper and lawful.

The *City of Miami v. Kory* case is particularly helpful in understanding why Defendant in this case cannot prevail in his argument to set aside the settlement agreement he knowingly and voluntarily signed.  In *Kory*, a probationary city employee was informed by her supervisor that she would be discharged.  394 So. 2d at 495.  The employee advised the supervisor that she was seeking another government job and that her termination would preclude her from securing another job with the city.  *Id.*  She, therefore, requested that she be allowed to resign instead.  *Id.*  Her supervisor replied that he did not object to her resignation and that the decision would be hers.  *Id.*  After she returned from lunch, the employee tendered her written resignation, which was accepted by the supervisor.  *Id.* at 495-96.

After unsuccessfully attempting to obtain other employment, the employee sought the advice of counsel.  *Id.* at 496.  It was then that she first learned that her supervisor, as the assistant director of his department, did not have the authority to discharge a probationer.  *Id.*  Under the city code, only the director of a department, with the approval of the City Manager, possesses the power to terminate a probationary employee.  *Id.*  As a result, if her supervisor's termination letter had been the cause of her  discharge, it

would have been ineffective as contrary to the requirements of the city's own regulations. *Id.*  The employee sued the City to set aside her resignation, contending that it was the product of duress created by the invalid notice of dismissal.  *Id.*

The Court's discussion of the employee's duress argument is illuminative here.  The Court begins by noting that the employee's decision to resign was initiated entirely by her, and was not suggested or forced upon her by her supervisor.  *Id.* at 497.  The Court states: "When, as here, a particular course of action is raised on one's own volition, and is finally decided upon in a deliberate and considered choice between alternatives, no finding of involuntariness, and thus no conclusion of duress may be sustained."  *Id.* Similarly, Defendant's attorney was the one who initially suggested entering into a settlement agreement to avoid the execution.  Defendant could have allowed the execution to take place and then challenged the judgment at a later date.  Instead, he chose to enter into a settlement agreement to stay the execution, so that he could continue operating his business uninterrupted by the seizure of his business assets.  That was certainly an understandable business decision; but one that was a deliberate choice between two bad alternatives.  That decision was not, however, the product of legal "duress."  It was instead valid consideration for enforcement of this agreement; Roberto gave up his right to pursue immediate collection efforts in exchange for a payment plan, while Maximo gave up his then-existing right to challenge the default judgment to the District Court or on appeal to the Eleventh Circuit.

Furthermore, the Court in *Kory* then adds that the city's conduct was not improper and, therefore, could not have constituted duress.  *Id.* at 498.  The only action undertaken by the city to cause the employee to resign was advising her that she was going to be discharged.  The Court points out that the city "had the perfect right to do just that, fire [the employee] as a then-probationer without cause."  *Id.*  The only thing

improper was the means by which the city was about to effect her discharge; that is, her supervisor, rather than the head of the department, was going to terminate her. *Id.* Regardless, the Court notes, this irregularity had nothing to do with the employee's decision to resign:

> To carry the burden of establishing the required causal connection between the unlawful conduct of the defendant and a resulting coerced action of the plaintiff, [the employee] would have had to show that she would not have resigned if the memo had been executed by the proper official, and thus that she was forced into resigning by the fact that it was signed by the wrong one. The record shows the exact opposite. [The employee] was not aware of the procedural deficiency and her actions were completely unrelated to its existence.

*Id.*

Here, Defendant's ability to establish a causal connection given the facts of this case is even more tenuous because there was nothing improper about Plaintiff attempting to execute on his valid final judgment. The best showing Defendant can make is that he would not have signed the settlement agreement had he known that he could move to set aside the default judgment. Defendant's attorney did not advise him that he could attempt to set aside the judgment; therefore, Defendant concludes that, as in *Kory*, his decision to settle the case was not motivated by anything other than his desire to stop the Marshals from lawfully seizing his business assets. Defendant testified that he had to sign the settlement agreement to stop the Marshals from removing property from his supermarket, so that he could continue operating. Yet:

> [A] threat to bring a civil action or to resort to remedies available under a contract is not such duress as will justify rescission of a transaction induced thereby. This is true even though it is subsequently determined that there is no legal right to enforce the claim, provided the threat is made in good faith, i.e., in the reasonable belief that a possible cause of action exists.

*Id.* (quoting Williston on Contracts).  Even if the default judgment could have been set aside, Plaintiff could not have caused Defendant duress by executing on the judgment before Defendant moved to set it aside.

Finally, "threatened action cannot constitute duress, when there are adequate legal remedies available with which to challenge it." *Id.* at 499.  The employee in *Kory* could have challenged the discharge, but her failure to do so cannot be deemed the result of duress. *Id.*  Similarly, Defendant could have moved to set aside the default judgment,[2] but he chose instead to enter into a settlement agreement to resolve the immediate problem of a Marshal's seizure.  Under the law, he cannot now claim that Plaintiff's execution of the judgment pressured him to involuntarily sign the agreement simply to avoid complying with the terms of the settlement.

Defendant took voluntary action at that point in consideration of what he considered to be a worse alternative, and knowing that his lawyer – on whom he was relying – was the primary cause of what had occurred.  In hindsight, that was likely a mistake because his arguments now on a motion to set aside the default judgment might have some traction.  The Court cannot, however, get to those arguments in the face of a written enforceable settlement agreement.  "It cannot [therefore] be held that [ ] he acted under duress, for, if so, every settlement of a disputed matter made under a mistake of law [or possible legal remedies available] could be overturned." *Id.* (citing *Mills v. Forest Preserve Dist. of Cook County*, 345 Ill. 503 (1931)).

Defendant further asserts that the settlement was not fully explained to him in Spanish and that he signed it on the advice of his counsel who had caused the default

---

[2]      The fact that Defendant did not know that he could move to vacate the default judgment does not make a difference in determining the question of whether the defect constituted actionable duress, which must be considered on an objective basis. *Kory*, 394 So. 2d at 499 (citing *Coffman v. Bolger*, 590 F.2d 1366 (5th Cir. 1979)).

judgment to be entered.  Plaintiff successfully rebuts this point by arguing that it is Defendant's responsibility not to sign a document that he does not understand.  "Persons not capable of reading English, as well as those who are, are free to elect to bind themselves to contract terms they sign without reading." *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton*, 467 So.2d 311, 313 (Fla. 5th DCA 1985).  Furthermore, "[t]he burden is on the person who cannot read to know that he cannot read and if he desires to have an instrument read and explained to him to select a reliable person to do so before he signs it." *Id*; *see also Hall v. Burger King Corp.*, 912 F. Supp. 1509, 1522 (S.D. Fla. 1995).

Plaintiff's counsel also credibly testified at the hearing that, on the day of the execution, Defendant's counsel borrowed his laptop so that he could read the settlement agreement, which was displayed on the computer screen, to Defendant.  Plaintiff's counsel further testified that Defendant's counsel looked at the computer screen and discussed the terms of the agreement in Spanish with Defendant over the course of ten to fifteen minutes.  According to Plaintiff's counsel, this was not the only time that Defendant discussed the settlement agreement with his counsel as the parties were still going back and forth, negotiating the terms of the agreement.  Even Defendant conceded at the hearing that, based on what his attorney told him,[3] he understood the settlement terms Plaintiff's counsel proposed.  On this record, it is thus evident that Defendant executed the agreement fully understanding its terms.

In reaching its decision, the Court struggled to find a legal remedy for Defendant, researching possible relief in different legal doctrines.  The issues presented by Defendant's motions are compelling.  Defendant's new lawyers make a good argument

---

[3]    Defendant testified that his attorney spoke Spanish and was able to communicate with him.

that a FLSA settlement in this amount is extraordinary, to say the least.  No matter how one tries to find a better solution, however, one ultimately reaches the same conclusion. The settlement agreement is enforceable and the Court is powerless to set it aside solely because it questions the ultimate result.  *See M&C Assocs.,* 682 So. 2d at 641 ("There is no requirement that the terms of a settlement agreement be confined to issues cognizable in the litigation giving rise to the dispute.  In fact, cases are often settled precisely because the parties agree to assume obligations or confer rights that a jury or the trial court would be unable to reach.").

Although the Court is dismayed by the lack of competence and professionalism with which a member of the bar handled the defense of this case, which resulted in great harm to the client, Defendant is pursuing the wrong avenue in seeking redress.  His only remedy at this point, however difficult or illusory that may be, is to pursue Mr. Emison in whatever lawful manner is appropriate to seek redress and compensation for his failures in this case.  The motion to stay or set aside the settlement agreement must be denied under Florida law that squarely governs this case.  *See also Davis v. Huskipower Outdoor Equip. Corp.,* 936 F.2d 193, 197-98 (5th Cir. 1991) (party or lawyer's mistake in entering into settlement agreement held not a basis to set aside agreement; "A party to a settlement who has the means in hand of ascertaining the facts, but neglects to use those means cannot thereafter have the settlement set aside because of mistake.") (quotation and citation omitted); *Gilbert v. United States,* 479 F.2d 1267, 1268-69 (2d Cir. 1973) (denying motion to set aside judgment based on settlement agreement; "Even if appellant had a claim against his own counsel for coercion or overbearing, this would not permit the settlement, one which is not claimed to have been unfair [by seaman in Jones Act litigation], here to be overturned."); *Kluver v. United States,* 1993 WL 759655, *2 (D. Minn. Oct. 22, 1993) (denying motion for to set aside settlement agreement because

"inaccurate advice, negligence and misrepresentations of attorney in advising clients about options and tax consequences of tax settlement cannot be used to set aside settlement agreement between I.R.S. and clients") (citing *Brinkman v. Commissioner,* ¶89,217 PH Memo T.C., at 1036-38 (1989)).

The Court's personal dissatisfaction with the end result is not a permissible ground upon which the Court can apply a different rule.  *See Martin v. Franklin Capital Corp.,* 546 U.S. 132, 126 S. Ct. 704, 710 (2005) ("Discretion is not whim, and limiting discretion according to legal standards help promote the basic principle of justice that like cases should be decided alike."); *Texas v. Johnson,* 491 U.S. 397, 420-22 (1989) (Kennedy, J., concurring) ("The hard fact is that sometimes we must make decisions we do not like.  We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result.  And so great is our commitment to the process that, except in the rare case, we do not pause to express distaste for the result, perhaps for fear of undermining a valued principle that dictates the decision.  This is one of those rare cases."); *In re M.V. Floreana,* 37 F. Supp. 2d 853, 854 (S.D. Tex. 1999) ("The assertion that something is unconscionable is little more than a distaste for the particular result.  Harsh results do not necessarily eviscerate otherwise sound principles.").

### B.    *Motion to Vacate Default Judgment*

From the foregoing, it is clear that it is unnecessary to address the issues raised by Defendant's motion to vacate the default judgment given that Defendant has ratified the terms of the default judgment with the settlement he entered into.  We note, however, that Defendant probably would not have been able to meet the standard necessary to set aside the default judgment.  In particular, the Court finds that Defendant would not have been able to show that a good reason existed for the action or inaction that resulted in the default.  *See Florida Physician's Ins. Co., Inc. v. Ehlers*, 8 F.3d 780, 783 (11th Cir. 1993).

"[F]or purposes of Rule 60(b), 'excusable neglect' is understood to encompass situations in which the failure to comply with a filing deadline is attributable to negligence." *Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848, 850 (11th Cir. 1996). Furthermore, "whether a party's neglect of a deadline may be excused is an equitable decision turning on 'all relevant circumstances surrounding the party's omission.'" *Id.*

Under this totality of circumstances standard, it cannot be said that Defendants' counsel's repeated noncompliance with this Court's orders constituted "excusable neglect" so as to entitle Defendants to relief under Rule 60(b). This is not an instance where counsel simply missed a single deadline on one occasion, due to circumstances that make the omission seem understandable in hindsight, such as where defendants' failure to act was due to confusion caused by an ambiguous notice of by a misunderstanding between co-counsel as to who was to be responsible for performing a particular task. Rather, this is a case where defense counsel, though having notice of the orders to which he was supposed to respond, simply disregarded the case for an extended period of time, resulting in multiple failures to comply with Court orders, which eventually led this Court to conclude that entry of a default was an appropriate sanction.

Additionally, Defendants also had a duty to supervise their attorney. The case law recognizes that, in evaluating whether an attorney's omission to meet a deadline constitutes excusable neglect, the conduct of the client in overseeing the attorney's actions must also be considered. *Pioneer Inv. Svcs. Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 396-97 (1993). If Defendants had better supervised their attorney, they would have realized that something was amiss. Indeed, the Court was so concerned with the prolonged failure of defense counsel to respond to orders and communications that it sent notices to the Defendants directly in addition to serving copies on counsel of record. Although Defendant cannot read English, he testified that

his wife does and that she helps him understand documents written in English. Defendant should have sought his wife's assistance in understanding the Court's mail regarding the lawsuit he was defending.  His failure to do so has resulted in a default judgment and, regrettably, the Court cannot at this stage assist Defendant in getting out of this unfortunate and costly predicament, one which hopefully will be remedied in time.[4]

### III.   CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Stay Compliance with Settlement Agreement [D.E. 40] is **DENIED** and Defendant's Motion to Set Aside and Vacate the Default and Default Final Judgment [D.E. 41] is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 15th day of June 2007.

EDWIN G. TORRES
United States Magistrate Judge

Copies provided to:
Honorable Joan A. Lenard

All counsel of record

Spencer Emison, Esq. (l/k/a)

Margarita Cimadevilla, Esq.
Florida Bar

Ad Hoc Committee Chairperson

---

[4]       A copy of this Order shall be delivered to the Florida Bar in furtherance of the pending investigation into Mr. Emison's conduct.  Additionally, the Court will, pursuant to its obligations under S.D. Fla. Local Atty. Discipline R. III.A, refer Spencer Emison to the Court's Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance, for investigation and prosecution of formal disciplinary proceedings.